American Trucking Association versus New York State Thruway Authority, et al. Go ahead, Mr. Rothfeld. Thank you, Your Honor. I am Charles Rothfeld, the Mayor Brown, representing the appellants in this manner. Under the Commerce Clause of the U.S. Constitution, the New York State Thruway cannot use tolls that are collected on the Thruway for purposes that are unrelated to the Thruway unless Congress has specifically set aside that Commerce Clause limitation. To my right, I just want to make sure that I understand precisely what we're being asked to do, that this appeal, as it's developed, is purely a matter of statutory construction to determine whether 1012e is sufficiently clear to evidence Congress's intent to validate this tolling scheme. Is that correct? I think that that's right. I mean, the standard that governs— It's not a constitutional issue. It's a statutory interpretation. It is, but it has significant constitutional overtones because the Supreme Court has said very clearly and emphatically what the standard that applies to this kind of argument. But that issue is not currently the issue before us. That is, if we were to decide for you that this statute does not exempt this from the Commerce Clause, we presumably would send it back and say to the District Court, in view of this statute being here and all the other things, other dormant Commerce Clause decisions, including a recent one of this Court, which the Supreme Court just yesterday or the day before denied cert on, is this a violation? We know the District Court originally, a very long time ago, said it thought it was a violation, but that isn't before. And in any event, it said that without the benefit of whatever gravitational pull on dormant Commerce Clause, which is a messy issue, this statute would have. So that the constitutional issue is not before us. The issue is, does this statute take you out of it so that we don't ever get to the other things? Is that right? That is absolutely right. Now, as you note, the District Court did some time ago issue a preliminary summary judgment for the plaintiffs in this case. And if the case goes back down to the District Court, when the dismissal came, the parties were actually engaged in class action, certification issues, and discovery as to the merits. Let's get back to this statute and why the statute, which on its face sounds as if it applies directly to this, it even mentions canals, doesn't exempt. Well, I think we have to look at the language of the statute. And there are two sentences of the statute that are relevant here. The first one says that notwithstanding specific federal statutory limits on the tolling authority, the Secretary of Transportation would allow tolling to continue, the continuance of tolls. What would you have Congress say in every case? Or what would you have us require Congress to say in every case? Because you're making from this clause, the notwithstanding clause, an argument that Congress needs to say more. It needs to refer to notwithstanding any other provision of any law. And yet in the second sentence, it specifically refers to this tolling system. Well, let me respond sort of to both sentences. On the first, it refers to the continuance of tolls. The tolls that were in place at the time Congress passed the statute had to comply with the Norman Commerce Clause. I think everybody agrees on that. And so Congress said these tolls, which— Excuse me. Your argument is an argument of context, not of text. I'm not saying context may not be relevant. But in terms of what the statute, the text, the text is mighty clear. It speaks specifically to this. Now, you are asking us to say, but the context of this statute, when it was passed and what it was doing about tolling, is such that we shouldn't read it as being that clear. And that may be an argument. But it's very hard for me, given that we have cases that statutes exempting from the Commerce Clause don't need to mention the Commerce Clause. If that weren't so, you could say they needed to mention. But we have cases which say they don't need to mention. I don't know what the statute could have said more. You can argue context, but I don't see how you can argue text. Well, I guess I would disagree with that, Your Honor, because the text on the face of it, I think, is ambiguous. The text allows the continuance of tolls. Tolls, generally speaking, comply with the Norman Commerce Clause. These tolls, tolls imposed by the thruway, did comply with the Norman Commerce Clause at the time of the enactment. And so continuance of tolls doesn't have independent meaning. It has to take its meaning from the situation in which it was enacted. It says it shall allow for the continuance of tolls without repayment of federal funds. That's correct. And so the tolls that were being collected at the time were tolls that had to comply with Norman Commerce Clause restrictions. The continuance of tolls in that setting would seem to mean continuance of tolls subject to the Commerce Clause restriction. The other part of the statute, which you also mentioned, involving excess tolls and uses that can be made of those tolls, there are two ways of looking at that statute, that language. When it refers to excess toll collections, the way we look at it, the standard that applies, the Commerce Clause standard that applies is not a precise standard. It requires only a rough correlation between the amount of the tolls collected and the uses that are made by the toll payer. And, therefore, necessarily there will inevitably be excess toll collections, even when one is complying with the Norman Commerce Clause standard. And we think Congress was saying in those situations these excess tolls must be used in a particular way. The State's position, the thruway's position, is no, no, when Congress set excess tolls, it was specifically authorizing the State to intentionally collect excess tolls in unlimited amounts. We think if that's what Congress had in mind, it would have used very different language. Waiving the Commerce Clause limitation is an extraordinary thing. The Supreme Court has found perhaps only a half a dozen times in the last century that Congress meant to do that. You would think if Congress meant to do that, it would have been affirmative. What would you, let's go back to what Judge Lohier has said. What would you, as a matter of text, have wanted this statute to say that would have made it clearer that it was not doing what appellees say that it did? I think that the statute could have said the State is authorized to collect tolls in this amount, collect tolls notwithstanding any restriction of federal law, statutory or otherwise, as it has said in other statutes. And I think if I may, I'll reserve the remainder of my time since I'm running short. Thank you. May it please the court. Andrew Amen for the Thruway Authority defendants. The district court rightly dismissed plaintiff's dormant commerce claims because the dormant commerce principles operate only where Congress has not acted, and here it has. Specifically, it authorized the New York State Thruway Authority. Is it the Thruway Authority's position that the State, and I understand that this retrospectively damages and that things have changed, but that the State here could have imposed a toll instead of 9 to 14 percent of 100 percent? They would have been required under the terms of the statute to provide for roadway maintenance and operations first. So the amount that they were permitted to spend on the canals was the amount that they were collecting that exceeded that. And under the exact same tolls, which the Thruway Authority was collecting before this statute and continued to collect after this statute until 2005, approximately 14 percent of what the Thruway Authority was collecting when the statute was enacted was going to debt service. And Congress knew that the debt would eventually be retired and that when that happened, the same tolls. 14 percent margin. Exactly. Would generate excess revenue. How about if the debt service had been, if 50 percent had been going to debt service? Would this language that we have before us have permitted the Thruway Authority to use the entirety of the 50 percent after its debt was paid off to use that for the canal? Yes. Okay. So any amount, frankly. What you're saying, my understanding you to say that this statute in effect said you, Thruway Authority, can raise the toll to whatever is necessary to maintain the canals. It doesn't mean that you're exempt from the Commerce Clause for everything else in the world, but as far as canals are concerned, we're telling you that you can use it. Now, they may have known how much was being spent or so on, but as far as these canals are concerned, you are exempt from it. Yes, that's exactly what Congress said when it said you can continue to collect your tolls and you can use them for these specified purposes. And that's not a crazy thing at all for Congress to have done. It was creating a new massive transportation reform that wanted to encourage development of interconnected alternative modes of transportation. Opposing counsel, not so much before us here, but in their brief, suggests that the context of this statute, whatever this textual language was, was a context that said that was in the direction of increasing the amount of allowing tolls to be done in an area where previously tolls were not allowed at all. And that this wasn't meant to exempt from the Commerce Clause, but simply to allow you to collect calls. Now, that's a context argument, saying that's how you should read this language. What is your answer to that? Our answer is that the context actually, far from helping my friend, supports the Thruway Authority's position. They cite in their reply brief Senate Report No. 10271 at page 26. That Senate report addresses not only language that eventually became Section 1012E of I.C.E.T., but also Section 1012A of I.C.E.T., which is the more general provision. And Congress there said that after debt is retired, tolls may be continued, this is a quote from the report, tolls may be continued for use on any transportation project eligible under Title 23, unquote. The House report that accompanied the bill that eventually became I.C.E.T., that's House Report No. 102-171, says at page 25 and page 80 that as to the new toll highways it was authorizing, that toll revenues would be required to be used first to pay off debt from the project being funded and to operate and maintain the facility during the period of repayment, and would provide a reasonable rate of return on capital invested by private parties. After the period of repayment, the state could use tolls both to operate and maintain the facility and to fund other transportation projects within the state, unquote. So you're saying to the extent that they go to context, then that opens things up to legislative history, and that if you look at legislative history rather than just the history, the legislative history cuts your way. And that you didn't cite, if you go to legislative history, you can also start asking what Senator Moynihan said, who is quite explicit about what he said. Now, you know, that's legislative history, and we worry about that, but once you get out from text to doing other things, why not look at that as well? Yes, our answer is that the text is clear. It's quite clear, as multiple of your honors have remarked. But if, arguendo, one thought there were some question, and that it was therefore appropriate to look at legislative history and extra legislative history, all of that points in our direction. Now, can one, when one is talking about explicitly exempting from the Commerce Clause, look beyond text? I believe there are some cases which say either the text or the history make explicit that the clause should not apply. Is that right? Yes, there are cases that say you can look to text and to legislative history. New England Power. New England Power, White v. Massachusetts Council of Construction Employers. So all of the very- Part of my question is why shouldn't it be the rule, given how extraordinarily rare it is that Congress will legislate in this way, to ask that Congress be more expressed? That is, that in addition to a reference to the statutory limitations, it either more broadly says notwithstanding any provision of Federal law, or even more expressly says notwithstanding any Commerce Clause issues. A couple of reasons. One, Your Honor, as Judge Calabresi has noted, there is case law, including Supreme Court case law, that says that Congress does not have to say in terms, whether in the text or the legislative history, we are abrogating Commerce Clause limitations. What has to be clear is that Congress authorized the activity that would otherwise be governed by the dormant Commerce Clause. And that makes sense because- Do I agree with that? Oh, right. Sorry. But here we have a clause that your friend has pointed us to that just refers to the statutory limitations. In the first sentence- Yes. But the second sentence speaks directly to the dormant Commerce issue that is presented here, which is how you use the tolls that you collect. And here Congress spoke directly to that issue, and it didn't say you can use those tolls for anything. It said you can use the tolls for specified purposes, which include specifically the canals. In addition, we didn't-this isn't self-executing language. New York, after this language was passed, duly went to the Federal Highway Administration, got the Federal Highway Administration's approval to modify its tripartite agreement, which included its ability to use tolls in this way. There's an annual audit compliance provision on page 165 of the Joint Appendix pursuant to which the Thruway Authority has made available audit information every year to the Federal Highway Administration. It's never complained. It's never said, give us our money back. Let me ask you what may sound a bit of a theoretical question, but that's me. The violations of a dormant Commerce clause are not anything that is that easy. I mean, you know, it's easy if you're putting it to the tariff or something of that sort, but there are any number of things which states do that may or may not violate the Commerce clause, and the question of tolls and how much and that is one of those things. I mean, you can do something and you can't do something else. Why, as a general matter, would it not be better to say this statute becomes part of a question of whether the dormant Commerce clause has been violated and that we should say not an exemption, which, after all, leaves you completely free, but that this becomes part of what the district court should consider in deciding whether the particular system that New York has set up is discriminatory or is not acceptable under this vague thing that is the Commerce clause. It is informing what violations of a dormant Commerce clause are by the existence of the statute. Why wouldn't that be a better way of handling it? The case law is clear, Your Honor, that where Congress authorizes an activity when it is exercising its Commerce power, and there is perhaps no more classic example of Congress affirmatively authorizing its Commerce power than in — Your answer is that might be so if Congress were less clear, but here they were clear enough. Here they were clear enough, and Congress does not need to say as an aside when it legislates under the Commerce power, and by the way, we're removing the limits that would otherwise apply under the dormant Commerce clause if we weren't legislating when we are legislating. And I would finally just say one last thought on that point. This isn't like Congress was acting under Section 5 of the 14th Amendment, where there had to be a violation and they had to act in a way that was proportioned to the violation that they found. This is Congress legislating to encourage the movement of tolls on and off different highway systems. Congress could do whatever, virtually whatever it wants to do in this area. That is correct, and what it did here was what the thruway authority then proceeded to implement. Thank you. Just a couple of very quick points. Discussing text and context, we think that both support us here, and I'll turn to the text first. The Supreme Court has said in cases like Granholm v. Hill that if the text can plausibly be read to preserve Commerce clause limitations, it must be read that way. The tie goes to the taxpayer, not to the State, because if it can be read both ways, necessarily it's not unambiguous. The Congressional intent is not absolutely clear, as it must be to displace the dormant Commerce clause. There are two sentences of the ICE-T legislation that we're talking about. The first says we are lifting statutory limitations and, as you pointed out, does not say anything at all about the Constitution. As your adversary pointed out, as I think I've determined, the Supreme Court has never required that level of clarity. Well, but simply as a matter of — No, the question is, is it clear enough? Not could it be even clearer. Well, is it completely, as the Supreme Court said, absolutely unambiguous that Congress was contemplating actions that otherwise were affirmatively barred by the State and was intending to permit them? I just — I think as a matter of ordinary statutory construction, if Congress could have lifted both expressly, if it lifted one expressly and didn't mention the other, you would think it — My question on that is, unless you are saying that they must mention the Commerce clause, which we have said no, that they — the Supreme Court has said no, that the robotic language kind of phrase is not necessary. That was manic. Then what is it? I mean, what makes something clearer? You can always, in every case, then say, oh, but they could have said this or that. But unless they are required to say Commerce clause, don't we just read it and see what it seems to mean? Isn't that what we do with tax? I don't disagree with that, Your Honor. But I can imagine — I'll give you an example. If Congress passed a law that said New York may discriminate against citizens of New Jersey in the imposition of tax rate and didn't mention the Commerce clause, I think we would agree that that was authorizing discrimination that otherwise would violate the Commerce clause because it's expressly stating something. The State is allowed to do it, and it was not allowed to do it before. Congress — I mean, you know, if they say discriminate, you're talking discriminate in what way? Obviously under the Commerce clause. I mean, that — But in the rates of taxation, for example. I mean, that would be sufficient, I would say. But that's not what Congress did here. There are, again, two sentences here. One says may continue — the continuance of tolls. That could be consistent with Commerce clause standards or not. And because previously it had to comply with the Commerce clause, I think the logical reading of that is Congress intended to continue that. The second sentence of the ICE-T legislation says excess tolls shall be available for these purposes. And as I say, there are two ways in which Congress could have had in mind excess tolls. One is our way, which is applying the ordinary Commerce clause standard. Inevitably, there are excess tolls that are collected. And I think Congress was saying when you collect these excess tolls, here's what you can use them for. The state says no, no. When Congress said excess tolls, it was affirmatively authorizing the state to collect excess tolls in any amount, as I think my friend acknowledges, any amount, using the toll collection mechanism of the highway as a means of raising general state revenue. That was a dramatic departure from what the federal tolling policy had been for generations. What are the damages? What's your view of the damages in this case? We had just gotten into the damages discovery. I think if the class were certified and total damages were collected, it would be in the range of $100 million, something like that. But we have not really gotten into that at this point. And you think that's in your clients. Your clients think that this is in their interest, that the state not be able effectively to maintain the New York thruway or the Erie Canal or whatever? No. The state can maintain the thruway. And we do not deny that under the Commerce Clause, for purposes of maintenance of the facility, states may impose tolls, user fees. That's perfectly fine. What we are saying is that the Erie Canal, which is not really a transportation facility in the real sense, it's not used to interstate commerce. It's what made America great. It did 150 years ago. According to Senator Moynihan. We endorse Senator Moynihan's views that the Erie Canal was a great thing in its day. But interstate truckers who get no benefit from the Erie Canal should not be forced to pay for it. But is the point of a dormant Commerce Clause to say that states may not do things that individual industries and so on don't like? Is it a kind of Lochner okay? Or is it to keep tariffs or commerce from being hindered? Because if it is the latter, rather than the former, we have to look at what Congress is saying, and saying this does not amount to the kind of tariff discrimination which blocks a national economy, which is what the dormant Commerce Clause, I would have thought, was there to do, not particularly to protect individual people. The Commerce Clause is not there to protect individual people. Of course, individual people, if they're hurt by it, can bring the suit. But what's the object of it? It's to make a national economy, not to protect truckers or bussers or teachers or anybody else. I agree with you on that, Your Honor. But I think that the nature of this kind of levy is precisely what the Commerce Clause was designed for, and as the Supreme Court has articulated, because allowing this kind of fee to be imposed lets a state export its tax burden to the residents of other states. And that's exactly what New York is trying to do here. It is trying to pay for a local facility. The question is, did Congress say that to this extent it can do it? That is the question. That's the question. Under its Commerce Clause, it could do it, and you're saying it should have been clearer if it intended to allow this. That's exactly right. I mean, the tie goes to the taxpayer because the — and just — I'll make this one final point, Your Honor. The reason the Supreme Court has articulated this very strict standard is that because this kind of fee is exporting the tax burden and is impeding interstate commerce, it is absolutely essential that representatives of other states know that they are authorizing this kind of commerce-impeding activity. And unless the legislation, either in its face or clearly in its context, is sufficiently clear, they will not know that, and therefore the state gets to export its tax burden. If that is so, that this is being done, does it matter that senators like Moynihan are saying, hey, this is what we're doing, so that the senators from other states know that what is going on? That is, you know, your argument now is one which might make legislative history or the statements of individual senators become relevant in a way that, because of Justice Scalia's very well-taken points, so often they are not. I mean, Senator Moynihan said, you know, that's what we're doing. I know my time has expired, Your Honor, but — Okay. I'll give Mr. Amen an opportunity to share a reply a bit, but we've given you some extra time. Go ahead. To answer Judge Calabresi's question, I think, in fact, it would be best if Congress in the text of the legislation made clear that it was displacing the Dormant Commerce Clause limitation so that one didn't have to go to legislative history. The further away one gets from absolutely clear text, the more difficult it is to conclude that Congress had an unabashed intent. And, in fact — Well, if you just look at Senator Moynihan's statement, and if that were the entirety of the history or series of statements, isn't it very clear that he would have sanctioned what the Thruway authority did here? I think not at all. Not at all. I think Senator Moynihan made one statement on the floor of the Senate that bears on this question, referring to — He was the senior Democrat on the committee at the time when the Democrats controlled the Senate, had been chairman of the committee before he became chairman of finance.  There's some weight to the views of the manager of legislation or the — And was he actually the manager? He may have been the manager. I don't deny that Senator Moynihan's views are entitled to weight. Considerable weight. But our suggestion is that his views are not supportive of the Thruway here. The only statement of Senator Moynihan that the Thruway identifies that actually talks about this question referred to the portion of the ICT that refers to the Maryland component of this, the Fort McHenry Tunnel. And he indicated that, in effect, New York would have the same benefit, right? And what he said there was that Senators Sarbanes and McColsey said that they thought it would be a good thing if toll revenues could be moved on and off particular transportation systems so that the state could maximize its transportation policy. I think that could be entirely consistent — Focus on Fort McHenry. Fort McHenry. And that could be entirely consistent with Dormant Commerce Clause standards. So long as it's an integrated transportation network, then users of one road are going to benefit from improvements that are made to other roads. So it's not at all clear from that statement that Senator Moynihan was thinking about departures from the Dormant Commerce Clause in any respect. The other aspect of Senator Moynihan that's gotten the most attention in the briefing is comments that he made at a field hearing in Albany. And if one looks closely at what he said and what others said, he was not referring to toll revenues at all. The only mention of toll revenue there was made by the Director of the Thruway, who didn't say anything about excess tolls. He was saying he wanted to be able to continue tolling after the repayment of the debt as a matter of changing the federal statutory repayment policy. Thanks very much, Mr. Ornstein. Great. Thank you, Your Honor. Let's give Mr. Amen the chance to at least take a minute or so to respond to your extended reply. Go ahead. Thank you, Your Honor. First, I would just like to clarify that the state canal system does continue to be a commercial instrumentality of interstate and international freight shipping. Tens of thousands of tons of cargo a year ply its waters. That's just purely for entertainment. It is not purely for entertainment. The history also, given my adversary's discussion. Friend. Sorry. He is my friend. As Justice Roberts has admonished us to address each other. The legislative history reinforces that Congress knew that it was authorizing exactly what Senator Moynihan said he was going to authorize. The language that ends up being in Section 1012E says any transportation facility that is under the jurisdiction of the Maryland Authority and the New York State Thruway Authority. That is clear enough that there doesn't have to be a specific nexus to the use of the thruway or the Fort McHenry Tunnel. Specifically, in addition. I don't think that's what your friend is actually arguing, but go ahead. I'm sorry. I understood him to be saying that when Senator Moynihan spoke, he was envisioning movement of toll money off of the highway that generated it in a way that would somehow comply with, that would somehow still benefit the specific users of that highway that generated the revenue. And the language, there's nothing in Senator Moynihan's language that suggests that. The language that ultimately became ICT 1012E refutes that. In addition, Senator Sims spoke after the conference committee had finally, in which Senator Moynihan was again a major player, finally hashed out what became 1012A and 1012E. Senator Sims speaking, this is at 137, Congressional Record 34930, that there is a, Congress is establishing, quote, a toll facilities program in which federal funding will be allowed for expansion of toll highways, bridges, or tunnels. The revenue generated might be considered for other transportation improvements. In the years following the adoption of ICT, not only New York, but a number of states began using funds, you know, toll revenues for other specified purposes that were not connected directly to the system that generated them. The Pennsylvania Turnpike Commission, for example, supplies or pays approximately $450 million a year for mass transit in Pennsylvania. And I'd like to finally, if I could conclude with one last thought, note that in response to whether the Dormant Commerce Clause is there to, you know, erect a barrier to things that certain industries don't like, on June 12th, 1991, along with Senator Moynihan, Lana Batts, a representative of the American Trucking Associations, appeared on the McNeil-Lehrer News Hour and was asked point blank, what from your perspective would be the downside of the Moynihan bill becoming law? That was the bill that Senator Moynihan had recently introduced that included, at least at that point, the language that eventually became 1012A of ICT. And Ms. Batts said in response, quote, or her response included these two statements, quote, there is far too much reliance paid on tolls and new toll facilities, unquote. And, quote, the highway user should not be viewed as a piggy bank for all of transportation, unquote. So American Trucking Associations was aware of what was going on. It complained about it. Congress passed this law anyway. Thank you very much. It's a piggy banking. We are permitted to use tolls in a way that we would not otherwise have been permitted. Metaphor. Yeah. Okay. Thank you very much. We'll reserve the decision. And it would be helpful, I think, if counsel, after today, make arrangements for the preparation of a transcript of the argument, which I think has been very good and would benefit all of us. Absolutely, Your Honor. Thanks very much. Thank you. Very good argument. Yeah, very good.